Filed 8/22/24

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE, | H049810 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C2016355) |
| v. | |
| JEFFREY DUVALL GUENTHER, | |
| Defendant and Appellant. | |


In this appeal, we examine the legal definition of—and appropriate jury instructions for—duress in a prosecution for sodomy and oral copulation by duress (Pen. Code, §§ 287, subd. (c)(2)(A), 286 subd. (c)(2)(A))[1] perpetrated on an adult victim. We consider the relationship between the crimes of sodomy and oral copulation by duress and a related provision criminalizing sodomy and oral copulation by threatening retaliation (§§ 287, subd. (c)(3), 286, subd. (c)(3)). Appellant contends the latter provisions were the proper charges under the law and facts, and the trial court prejudicially erred in its instructions to the jury. In deciding this appeal, we review the statutory language and legislative history of sections 286 and 287, case authority on sexual offenses involving duress, and the extensive trial evidence of the relationship

---

[1] Unspecified statutory references are to the Penal Code.

between the defendant and the victim.  We conclude that the trial court did not err in its instructions on duress.

A jury convicted appellant Jeffrey Duvall Guenther of 20 total counts of oral copulation by duress and sodomy by duress (§§ 287, subd. (c)(2)(A), 286, subd. (c)(2)(A)) against Jane Doe.[2]  The trial court sentenced him to consecutive lower terms of three years on each count for a total prison sentence of 60 years.

Doe was an employee in Guenther's insurance company.  For many months, Doe and Guenther engaged in an in-office romantic and sexual affair.  Over time, Guenther became more controlling and verbally abusive of Doe, requiring her to participate in a daily routine of providing him oral sex each morning and submitting to anal sex each afternoon, as well as on weekends when so directed.  At trial, Doe testified that she participated consensually in the sex acts for many months.  However, as Guenther's demands and treatment of her worsened, she expressed to him that she wanted to end the sexual relationship.  He told Doe that he would decide when she could "just be [his] employee.".  Guenther compelled Doe to continue submitting to daily sex acts by intensifying his control over her daily activities and threatening variously to terminate her employment, reduce her pay, and leave her to her debts if she failed to service him sexually and submit to his demands.  Guenther testified at trial that he believed, based on the nature of their relationship and what he perceived as Doe's continued expressions of love and sexual interest, that the charged sex acts were consensual.

On appeal, Guenther challenges the jury instructions on duress as the means of accomplishing the sex offenses and on the reasonable "mistake of fact" defense as it applies in the context of those offenses.  Guenther also asserts the trial court erred in allowing Doe to express her lay opinion as to whether Guenther believed the charged acts were consensual.  Guenther further challenges his sentence as a de facto life term without

_____

[2] "Jane Doe" is a pseudonym used in the information.  We refer to her in the same way to protect her privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4).)

the possibility of parole in violation of the constitutional prohibitions against cruel and/or unusual punishment.

For the reasons explained below, we conclude that Guenther has not demonstrated reversible error as to any of his claims on appeal. We affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. *Procedural History*

In July 2021, the Santa Clara County District Attorney filed a first amended information (information) charging Guenther with 10 counts each of oral copulation by force, violence, menace, duress, or fear (§ 287, subd. (c)(2)(A); counts 1–10) and sodomy by force, violence, menace, duress, or fear (§ 286, subd. (c)(2)(A); counts 11–20).[3] The information named Jane Doe as the alleged victim in all 20 counts, which allegedly occurred between September 6, 2020, and November 18, 2020.

The jury trial began in late May 2021. Doe testified over the course of seven days, and Guenther testified in his own defense. The theory of prosecution, reflected in the verdict forms submitted to the jury, was that Guenther had committed the charged crimes by duress. The jury found Guenther guilty of all 20 counts.

In February 2022, the trial court denied a motion for a new trial filed by Guenther on grounds including insufficient evidence to establish the theory of duress. The court sentenced Guenther to consecutive mitigated terms of three years as to each of the 10 counts of oral copulation and 10 counts of sodomy, for a total of 60 years in state prison.

---

[3] Guenther was first charged in a felony complaint in December 2020, followed by an information filed in January 2021.

*B. Summary of Evidence Presented at Trial[4]*

    1. <u>Jane Doe</u>

Doe was 36 years old at the time of the trial and had a 14-year-old daughter.  She had been living in Gilroy for about nine years and was divorced.  Doe has a high school education and has earned a few certifications, including her insurance license in August 2018 while employed at Guenther's company.

In 2018, Doe was experiencing financial hardship and had medical debt.  Doe had previously been employed as an administrative assistant but left the job because she did not like her manager.  Doe's church pastor referred her to an individual who sent her resume to South Valley Insurance (SVI), a local insurance company owned by Guenther.  SVI specializes in providing and servicing group health and other insurance benefits for small businesses.  Doe interviewed with Guenther in March 2018, and he offered her a position with SVI.

Doe began working for SVI in mid-April 2018 and performed secretarial and client account management services.  Guenther's father also worked for the company at that time but retired shortly after Doe's employment.  Other than a part-time summer intern, Doe for several months was the only employee other than Guenther.  She was new to the insurance industry, and Guenther provided her training.  Guenther began to flirt with Doe about a week after she was hired.  She initially felt shy and uncomfortable but became more comfortable as she saw how hard he worked to build his business, which she admired.

---

[4] The parties have submitted comprehensive briefing on appeal of the evidence presented at trial.  A substantial part of this evidence consists of witness testimony detailing 18 months of Instagram direct messenger communications (which we refer to generically as "text messages") between Guenther and Doe.  Copies of the text messages were admitted into evidence.  Many of these communications contain sexually explicit and/or demeaning language.  We quote from them only as necessary to present and analyze the issues on appeal.

On May 10, 2018, Doe stayed at the office to attend a small business function with Guenther. Guenther opened a bottle of wine he kept on hand for clients and became flirtatious. Doe was sitting in a chair across from Guenther's desk. He came to her side, unzipped his pants to expose his erect penis, and pushed her head towards him. She was surprised and uncomfortable. She performed oral sex on him though he did not ejaculate. There was no kissing or discussion beforehand and the fellatio "wasn't necessarily consensual." On the way back from the event in his car, Guenther held Doe's hand.

After May 10, 2018, Guenther continued to be flirtatious with Doe, and she reciprocated. They began to be physically intimate, including "hand jobs," oral sex by and for both partners, and within a few months, sexual intercourse and anal sex. Doe enjoyed the attention Guenther gave her. She knew he was married and had children and "hated" herself for being intimate with him but was "lonely" and liked the relationship. The relationship was exciting, and Doe enjoyed the sex. They used a "butt plug" to facilitate anal sex, which she brought from home, and other sex toys that Guenther introduced, including a vibrator that was primarily for Doe.

During the first months of her employment, through the summer of 2018, Doe quickly learned the insurance work and was able to assist Guenther substantially with administrative tasks, allowing him to focus on other aspects of the business. He "treated [her] well." It also became "standard" that she would "have to stop work to fulfill his . . . physical needs" by performing sex acts. At the beginning, the intimacy did not occur daily but after about two months became more frequent. Doe thought of the relationship as a "friends with benefits type of . . . a thing," even though he was her boss.

Guenther did not condition any employment benefits on sex during that time, and Doe willingly participated. She was the first to say " 'I love you,' " and he later reciprocated. There were two times early in 2018 that Guenther "ended it," which made Doe unhappy. They restarted the relationship each time shortly after and agreed it would have to be "mutual" for one of them to end it.

5

SVI paid for Doe to prepare for and take the exam for her insurance license, which she received in August 2018. Doe received a raise in her hourly pay after obtaining her license. Doe received an additional raise and became a salaried employee in November 2019.

Doe and Guenther eventually began communicating outside of work by text message, primarily through Instagram's direct messaging application. This platform allowed them to communicate privately with texts, photos, and videos and allowed a user to "unsend" a message. Doe did not tell anyone about the relationship with Guenther. Their sexual relations occurred in the office. They never went to a hotel, to dinner or a movie, or on any kind of traditional date. Guenther told Doe that if they saw each other outside of the office—at church, for example—she was to pretend she did not know him.

Beginning in 2019, other employees joined SVI. Doe and Guenther continued to work alone in the early mornings and late afternoons. Ashley became an administrative assistant in January 2019, taking over many of the administrative tasks from Doe, and Stacy joined in November 2019 as an account manager, in a position similar to Doe's. Doe worked from 8:00 a.m. to 5:00 p.m., and the other employees arrived at 10:00 a.m. and left at 2:00 or 3:00 p.m. During the COVID-19 pandemic, Doe continued to go into the office.

Doe first saw "a different side" of Guenther in September 2018. Doe knew Guenther was married and there was "no future" with him. She wanted a real relationship. A man she had begun dating sent flowers to the office on her birthday. Guenther was "upset." About two weeks later, Guenther instructed Doe to end the relationship with the man. Guenther "became very possessive" and when angry would give Doe the "silent treatment" but continued to be "in control" of their physical relationship. There was a lot of tension during that period. When Guenther found out in July 2019 that Doe had started to date someone else, he became upset and made clear that she was not allowed to do so.

6

Doe's relationship with Guenther changed further sometime around September 2019. Doe was helping out a friend's son, who was 18 or 19 years old at the time, by giving him a ride to church. Guenther became jealous. He told Doe in a text message on September 22, 2019, " 'I'm not happy with how you're interacting with him. We need to correct this. I need a detailed explanation and a change in your interacting or we're going to have a problem. Take this seriously.' " He continued, " 'Be careful. You don't have my approval to date, as we discussed before, and I don't approve. We need to talk or there will be consequences. Not joking.' " He began to check Doe's social media on Facebook and Instagram and would make her "unfriend and unfollow every single guy" so she could only stay connected with a male who was a relative. Guenther would "call [Doe] names" like "weak," "bitch," and "whore" and "belittle [her]." She repeatedly told him she did not like the name calling, which he mostly did through text messages, but he did not stop.

Doe's sexual relations with Guenther occurred only in the office, with a few occasions in Guenther's vehicle going to client meetings, twice in Guenther's home when his wife and children were away, and once at her house when he "invited himself over." Doe testified that the relationship was consensual and she "cared about" Guenther "as [] you would care about a family member." She was not in love with him, but she would tell him she loved him, and he later started to say that he loved her. She continued to be intimate with Guenther despite the name calling because she "[f]elt like [she] had to." She did not call him names, and he instructed her "to praise him and give him compliments." They never discussed that he would call her names or demean her as part of their relationship.

For Doe, the sexual relationship became "harder to . . . tolerate" and by the fall of 2019 there was a "routine morning activity" in place. The routine required Doe at "8:15 on the dot" to make sure all hallway doors were closed and "scope out" if anyone else had arrived to see how quiet they needed to be. Guenther would be waiting in his office

7

chair and she "had to go sit in front of him" and either orally copulate him or masturbate him. She "could not be a minute late." She had to act as if she "loved it" and was not allowed to gag or spit out his semen during oral sex. Doe began to feel "over it" and "very frustrated with having to endure" Guenther's "need for control, both at work sexually and even controlling [her] own personal time."

Around November 2019, when Stacy was hired, Doe began to tell Guenther that she "just wanted to work" and "not do the sexual things," but Guenther did not allow that. He told her that he would decide when she could "just . . . be his employee" without the sexual relationship. Guenther was "able to use the excuse of salary" to require her to come in on weekends and stay later without having to pay overtime.

In addition to the morning routine, there developed a daily afternoon routine of anal sex. It started when Doe made a comment that Guenther better not get her pregnant when they would have vaginal intercourse. Doe suggested they could "just stop," but Guenther told her that was not an option and instead they would have anal sex.

Guenther would consistently tell her when and what sex act they would be doing.[5] She put up with his sexual demands and verbal abuse,[6] and tried to play along with his

---

[5] During her testimony, Doe reviewed and testified regarding 15 months of excerpted text messages between herself and Guenther (spanning from September 2019 through November 2020). Many of these contain commands from Guenther to Doe. For example, on November 12, 2019, at 8:32 a.m., the following text exchange occurred: Guenther: "Almost ready to eat some warm gooey sperm?" Doe: "[W]hatever and whenever daddy wants." Guenther: "8:38 on your knees in front of me." On December 5, 2019, at 8:28 p.m., Guenther wrote to Doe, "On your ass in front of me at 7:45, sucking my cock. No talking [emoji]."

[6] The record contains many text messages that contain demeaning language used by Guenther about Doe. For example, on November 28, 2019, at 9:26 p.m., the following text exchange occurred. "[Guenther:] You are mine . . . [¶] I own you [emojis]. . . . [¶] I love you. . . . [¶] . . . [Doe:] Yes. Yes you do love me. [¶] It's so obvious . . . . [emoji] [¶] And yes I am yours. And yes, you basically do own me. [Emoji] . . . [¶] [Guenther:] Ain't no 'basically' [¶] Haha . . . [¶] Owned bitch" followed by a "kissy" emoji. On June 13, 2020, at 9:35 p.m.: "[Guenther:] Who's your king bitch? [¶] [Doe:]

8

games, like calling him " 'king' " and " 'daddy' " to try to keep him happy and because she felt she "had to."  Doe felt that "to keep him happy and keep [her] job, [she] had to go along with his program."

The relationship continued to grow "more and more controlling."  Guenther would get upset if Doe tried to express an opinion, and he required her to always have her phone with her and "acknowledge his messages instantly and respond."  If she was not responsive to his messages, Guenther got upset.  He would curse and call her names or make threats about her job and about her pay.[7]  Doe also had to "like" and comment on his social media posts.  She "couldn't even fall asleep without his approval."  Guenther also told Doe not to get close with her coworker Stacy or be connected to her on social media.

---

You  [¶]  [Guenther:]  That's right  [¶]  It's night night when I say so  [¶]  You [k]now this  [¶]  . . .  [¶]  Dumb bitch  [¶]  [Doe:]  Why do you always have to call me horrible names?  [¶]  . . . [¶]  [Guenther:]  Lesson 1: don't talk  [¶]  Lesson 2:  don't talk back  [¶]  Lesson 3:  shut the fuck up BITCH  [¶]  haha  [¶]  You should quit, [I don't think] you can hang . . .  [¶]  So weak, why I'd never be with you hahah  [¶]  You are weak  [¶]  . . . [¶]  Get that butt plug ready  [¶]  Make me lasagna  [¶]  Clean that pussy."

[7] For example, on January 16, 2020, at 6:37 p.m.:  "[Guenther:]  Just remember, I am the fucking king and SVI is my domain.  Anyone that can't fall in line & submit to him can get the fuck out of the kingdom.  The king has many benefits and is generous to his people.  Those who are wise will keep this at the forefront of their minds.  Insubordination will not be tolerated & will be dealt with severely.  Loyalty will be regarded with riches and security.  [¶]  [Doe:]  I'll remember.  [¶]  [Guenther:]  I'm giving you fair warning for tomorrow.  One way or another, mouth & ass is going to happen.  And we'll enjoy coffee in the [a.m.] and whiskey in the [p.m.].  Happy pre-Friday.  [¶]  [Doe:]  Yes, sir."
    On May 3, 2020, at 7:25 p.m.:  "[Guenther, in reference to Doe telling him that she had gotten a phone call from an ex-boyfriend:]  Better be 100 [percent] blocked so he can't communicate or you're going to get ass raped 7 days this week [smiley emoji]  [¶]  Hello?  [¶]  . . .  [¶]  Answer me b [itch] . . . [¶]  . . . [¶]  Or how about this, don't block him & live in the past with no job."
    On July 22, 2020, at 10:01 p.m.:  "[Doe:]  Don't get angry if I doze off.  [¶]  [Guenther:]  Don't get angry if you're [*sic*] pay drops significantly, don't think I won't."

In October 2020, Guenther changed Doe's pay structure by deducting $1,000 from her monthly pay and making that amount a flexible bonus that he had the power to take away. He "made it to be more of a caveat that [she] had earned that $1,000." It "all boiled down to" Doe having to "keep him happy in order to keep [her] job."

Doe testified it would be "nearly impossible" for her to give a precise date for when the sexual relationship became nonconsensual.[8] As early as 2019, there were times that she participated in sex acts out of fear of losing her job or pay. She became "paranoid" and did not want to lose her job, which by that time included client-facing work that she "loved." Doe did not think about working elsewhere because she "loved the job and [she] loved the clients specifically" and "needed to provide for [her] daughter."

By April 2020, until the day she was fired on November 18, 2020, Doe was required to perform oral sex or "hand jobs" for Guenther every weekday morning and submit to anal sex every weekday afternoon, as well as on some weekends. Though there were a few occasions when Doe found the anal sex pleasurable, it was not something she wanted to do. If Doe tried to say no to a sex act, Guenther would make her apologize by telling her she was "mean and rude" and needed to apologize. She "never had the option" of saying no.[9] If she was busy or late to perform a sex act, he would be angry and call her names or criticize and threaten her.

In a lengthy text the evening of April 4, 2020, Guenther criticized Doe for being " '[g]ross,' " a " 'weakling,' " " 'square,' " and a " 'prude' " because she did not like watching pornography with him, then threatened that he could " 'eliminate' " her and

_____

[8] The information charged that Guenther's crimes against Doe began "[o]n or about" September 6, 2020.

[9] In a text exchange on March 5, 2020, Doe apologized that anal sex did not happen that afternoon. Guenther wrote, "I wasn't upset at that. If I really wanted anal I'd get it. 100[%] . . . [¶] . . . [¶] But since you asked, I control the sex & if I want anal, I'll have it. So you saying 'no' does nothing good for you in the end. Being submissive is always the best."

10

threatened her pay and job.[10]  The next day, which was a Sunday, Guenther texted Doe " '1:30' " plus two emojis signifying she should be at the office and ready for anal sex at 1:30 p.m.  When she noted that she thought she would not see him until the next week, he texted that " 'can be arranged' " but it would " 'likely turn into the same thing that happened with Ashley,' " who was an employee that Guenther had let go.  Doe understood that if she did not want to be let go or not paid for the week, she needed to meet him at the office for anal sex.

On July 1, 2020, in a text exchange starting at 10:19 p.m., Guenther told Doe there would be " 'no more days off in 2020' " after she took the day off for her daughter's birthday.  When Doe did not respond to Guenther's subsequent text telling her if she were smart she would " 'pay [him] back big time' " by being nice, owning up to her failures, and " 'suck[ing] a fatty [performing oral sex on him],' " Guenther texted: " 'You are such a bitch you are never getting another night off bitch.  [¶] . . . [¶]  Haha.  Stupid girl.  But you will suck my cock tomorrow.  And take it in the ass at 4:05.' "

If Guenther went to bed unhappy on a Friday or Saturday, Doe would have to come to the office in the morning and give him "whatever he wanted, whether it be a hand job or blow job."  Sometimes Guenther's children would be in the office on the weekends, in a different suite, and he would direct Doe to enter the building by the back stairs and go directly to his office to perform sex acts without his children knowing she was there.  Guenther would text " 'My door' " which meant Doe was to enter through his

---

[10] The text exchange, in part, reads:  " '[Guenther:]  Gross.  [¶]  I hate square women. . . .  [¶] . . . [¶]  You don't deserve me.  [¶]  G[ood night] weakling . . .  [¶] . . . [¶]  Weak women don't appeal to me, you seem to have it in spades  [¶] . . . [¶]  Clearly the weaker sex  [¶]  [Doe:]  Clearly  [¶]  [Guenther:]  Your passive behavior disgusts me  [¶]  I could [] eliminate you if I wanted to  [¶] . . . [¶]  Square  [¶]  Close minded  [¶]  Old school  [¶]  Conservative  [¶]  Gross  [¶]  Step the fuck up  [¶] . . . [¶] . . .  How about this:  no pay ALL OF NEXT WEEK.  Not joking.  You fuck with me, you're done. . . .  [¶]  Don't text me tomorrow either  [¶]  I will fire you so fast  [¶]  [Doe:] Acknowledged."

side door because his children were present. On September 6, 2020, at 9:27 p.m., which was the Sunday of Labor Day weekend, Guenther wrote, "On your knees in my office at 8:00:00 [a.m.], it's your job! [emoji] [¶] . . . [¶] The kids will be there, so be discrete."

Doe testified that as of September 7, 2020, she performed the sex acts, which occurred "twice a day, like clockwork" five days a week, and sometimes six or seven days a week, because Guenther threatened to fire her if she did not. She understood based on their interactions and communications that the sex acts were "a requirement" for keeping her job. Doe estimated that she performed over 100 sex acts between September 7 and November 18, 2020.

On the afternoon of October 12, 2020, Doe and Guenther had gone into one of the office suites around 5:00 p.m. for the afternoon routine of anal sex, drinks, and TV. She thought he was in a "good space" to ask something she had been wondering. She told him she had noticed he sometimes would hold up his phone while she was orally copulating him in the mornings. She asked whether he had been taking pictures of her. Guenther "got extremely defensive and extremely angry" and yelled at her for being so rude, then grabbed her phone which had started to ring and threw it across the conference room. The phone smashed into the wall and the back of it shattered. Doe was scared and had never seen him in that "extreme state" before. Guenther told Doe to go across the hall and clean out her desk, which she did. She was angry. As she packed her things, she took an orchid he had given her for her birthday and threw it on the ground, breaking the pot. She left believing she had been fired.

A day or so after, Guenther contacted Doe and informed her that she "needed to apologize and beg – plead for [her] job." Doe complied because she "didn't know how [she would] survive financially without it." She had pay and health benefits that she did not want to lose, along with other "[a]mazing" perks like a short commute and great clients. Doe "loved the work."

12

After she pleaded by text, he told her they needed to talk. Guenther picked her up at her house. He had brought a typewritten list of requirements, which he read to her. Doe later recreated the list by writing down everything she remembered from it. The list "made [] more concrete" many of the rules that Doe already understood she had to follow. These included that she "had to work out every single day"; she "had to masturbate every single day for ten minutes or until [she] reached orgasm"; she "had to not complain or make a face or comment on the taste or consistency or amount of his semen . . . during oral sex"; she "had to give him compliments[,] . . . to respect him[,] . . . to say nice things"; and she "had to revere him." She also could "not cry." The list also imposed new requirements, including a "final date" by which Doe had to stop her home business.

The list reflected expectations that Doe and Guenther had discussed before. Guenther wanted to her to exercise so she would lose weight, and he wanted her to masturbate daily to increase her sex drive, which "was basically dead." The requirement that she not complain about swallowing his semen during oral sex was something he had already insisted upon. Guenther routinely told her that she needed to get better at complimenting him and saying nice things about how he looked, his hair, how he was dressed, and how he worked. She "had to constantly praise him," and he would grow angry or frustrated when she failed to do so. Sometimes during anal sex she would cry because she "felt extremely violated" and it was painful, and Guenther would get angry that she cried. Regarding her home business, Guenther did not like her earning income outside of SVI, and the final date to end her home business was so Doe would focus all her attention on her work for SVI.

Guenther told Doe she could return to work if she agreed to everything on the list, and Doe "reluctantly agreed." Doe did not consider looking for another job because she was "hopeful that he would come to his senses and realize that he [was] being unreasonable." Guenther would often tell her she would be "nothing without him," that

13

he had saved her, and that no one would want to hire her because she did not have a college education. Guenther would remind Doe that people would come to him as a reference if she applied for another job and would suggest she should look for work at McDonald's or Starbucks. Doe never told Guenther that she wanted him to dominate her or agreed on a sex routine but felt like she had no choice if she wanted to keep her job.

After the October incident, Guenther changed Doe's salary structure. As mentioned, *ante*, he reduced her monthly salary by $1,000 and made that amount a "bonus" that she could earn. Guenther informed payroll that the change, which reduced her salary by $12,000 and amounted to a potential $12,000 yearly bonus, would " 'be best to allow [Doe] more flexibil[ity] with her duties. This [was] to be effective 10/16/20.' " Guenther also created what he called a "Love250" policy whereby he would have to pay Doe a $250 "retention bonus" if he mistreated her (i.e., by verbally abusing her in the evenings when he had been drinking), though he also employed it to reduce her pay by $250 when she displeased him. In a text exchange on the night of October 18, 2020, Guenther berated Doe for being " 'shit' " and crying " 'like a baby' " and told her she should have taken their time together " 'more seriously,' " then texted her a screenshot of his communication to payroll to reduce Doe's bonus that pay cycle by $250. Guenther threatened Doe with further pay loss that pay cycle, stating " 'that money is gone, and more, too, if you keep being a stupid bitch. Your rent is fucked if you keep being stupid.' " After additional texts suggesting he might tell payroll to further reduce her pay, Doe told Guenther she was " 'sorry,' " and Guenther responded that it was " '[t]he greatest thing [Doe] ever said about yourself, put it in a frame because babe, you are [sorry]. Just be ready to eat all my cum tomorrow.' " In another exchange on October 31, 2020, Guenther peppered Doe with commands about the sex acts she would be performing for him, berated her, told her she had lost her entire $1,000 " 'bonus' " that month, and warned her she was " 'one step away from [him] lowering her pay,' " was

14

" 'almost paid less than Stacy now.  Haha,' " and should be " '[b]e at the office on [her] ass at 8:20, ready to suck.' "

On the evening of November 17, 2020, Doe and Guenther had a text exchange in which she apologized and asked forgiveness for having told Guenther during the afternoon anal sex session that he "need[ed] to work on patience" in response to his impatience when she "did not bend over quick enough" (getting into position for anal sex).  Guenther wrote, " 'Do not ever tell me what you think "I need to work on."  Foolish woman.  . . .  Work on your apology and start again.  I will keep you up late and deduct a ton from your December bonus, so be better.' "  He texted later that night, " 'You just lost $250 in December.  Try me, stupid.' "

The next morning, November 18, Doe had to take her parents, who were moving, to the airport.  Doe texted Guenther around 7:45 a.m. to let him know there was a delay, and she was still at the airport and would arrive late.  Guenther was upset and texted that she had to make sure she was at work by 8:40 a.m.  Doe was scared because he had already told her the night before that she had lost part of her pay.  Doe arrived at the office at 8:41 a.m. and "had to close the door behind [her] and immediately go sit down in front of [Guenther] and give him a blow job."  They did not speak.  Doe was crying, which violated Guenther's "rules," and afterward went to her desk and cried.  Guenther left the office shortly after.  Stacy came to ask Doe a question and Doe began crying.  Doe confided to Stacy that she was in a nonconsensual sexual relationship with Guenther.  It was the first time Doe told anyone about the relationship.  Stacy later checked on Doe to see if she would be taking a lunch break, and Doe said no because Guenther had told her that since she had arrived 41 minutes late, she needed to take that time out of her lunch break.

Later that afternoon, Guenther had Doe call him from outside the office.  He was very angry and told her that he had been watching the security camera footage from his house.  He had overheard Doe talking to Stacy about her limited lunch break and

15

mocking him that he could take extended lunches whenever he wanted. He said he could no longer trust her because she did not "have his back" and was speaking badly about him to his employees. Doe apologized but felt she "had to stand up" because he was "getting more and more abusive." She told Guenther that the physical relationship was over, that she would "remain his employee" and "always speak highly of him" to clients and employees and "have his back, but it's over."

Guenther sent Doe on an errand for the office and asked her over the phone if she took back what she had said earlier, which Doe understood as a reference to her statement that the sexual relationship was over. She confirmed the sexual relationship was over. When she returned to the office, the other employees were gone. Guenther gave Doe a "speech" thanking her for her years of hard work and reading from a list he had printed of reasons he had to fire her based on her work performance. Doe packed her things and left the office.

Doe testified that she did not consensually engage in oral copulation and anal sex with Guenther between September 6 and November 18, 2020. She did not believe that her expressions of love and admiration in September, October, and November 2020 "fooled him" into thinking she was participating willingly, otherwise he would not have required her "to show these external acts of submission."

Several days after Guenther fired her, after confiding in a friend, Doe decided to go to the police. She did not know if Guenther had committed any crime. Detective Rocha of the Gilroy Police Department interviewed Doe and asked her to participate in a recorded phone call with Guenther, which she did on December 1, 2020. Guenther tried to contact Doe multiple times after that call, and Doe did not respond except on December 3, when Guenther called her from a blocked number, and she answered. She recorded that call, in which he offered to hand deliver $10,000 to her so there would be no "ill will," which she understood to mean she would have to keep silent. She did not

16

accept the money. Doe later contacted a civil attorney but at the time of trial had not pursued any civil case against Guenther apart from obtaining a restraining order.

On cross-examination, Doe acknowledged that she had prior experience leaving a job due to a toxic work environment, that she was never held captive at SVI, that she "came and went on [her] own two feet," and that she loved her job there. She acknowledged that being in a sexual relationship with one's boss could create problems at work if the relationship did not go well or end well. Doe also acknowledged there were "[o]ccasionally" happy days in 2020 and there were times she enjoyed the sex. There were also times before and after September 2020 in which she engaged in crass sexual banter with Guenther, sent sexually suggestive texts, and expressed a deep connection with Guenther and sadness that she could not be more a part of his life and had to remain a secret.

On March 4, 2020, Doe had texted Guenther that she " 'never intimately loved or adored or admired or respected any human more than' " she did him and " '[t]here are no English words that carry enough depth and weight to convey how much' " she loved him. Doe enjoyed spoiling Guenther. There were times she "meant every word" and other times in which she knew what he expected her to say and "would say those things to appease him." Their relationship was "very nuanced." She "[m]ost of the time" liked that he was in charge. Doe denied that she ever intended to use her sexual relationship with Guenther to gain more benefits or pay at SVI or to pursue him in a civil suit after her job at SVI ended.

### 2. Other Prosecution Witnesses

Doe's coworker Stacy Hinde testified that she began working for Guenther at SVI in November 2019. Hinde was hired as an account manager and obtained her insurance license while working at SVI. Her hours were 9:00 a.m. to 4:00 p.m. She did not work weekends or outside of her scheduled hours. Doe, who was the senior account manager, worked a longer 8:00 a.m. to 5:00 p.m. schedule.

17

Hinde was not aware of the sexual relationship between Doe and Guenther, though she had observed an interaction in June 2020 that made her wonder if "there was something going on." Doe later disclosed to Hinde about the relationship. Doe was distraught and "crying hysterically and had a hard time composing herself." Later that day, Guenther arrived and told Hinde and the other coworkers to finish what they were doing and leave for the day because he had some things to discuss with Doe. Hinde returned to the office the next day to find her things had been moved to Doe's office. Hinde and Doe had become "close friends" and she stayed in touch with Doe. Hinde later sent Doe a list of SVI's clients at Doe's request even though she knew Guenther would not approve of her doing that.

Officer Esthela Rocha is an investigating officer with the Gilroy Police Department. Rocha testified that Doe appeared very confused and distraught during her interviews with Rocha on November 30 and December 3, 2020. Doe gave Rocha the handwritten list that she recreated after she was fired of the "requirements" Guenther had imposed on her.

Dr. Mindy Mechanic is a clinical and forensic psychologist specializing in the psychological consequences of trauma in victimization, especially sexual assault and intimate partner violence. She testified as an expert in counterintuitive victim behaviors and myths and misconceptions about victims of intimate partner violence and sexual assault. This included "to some extent" workplace sexual assault and intimate partner violence in the military when there is a "power differential . . . between a higher ranking or a more senior person in a workplace context with a more junior person." She testified that the "difference in power is destabilizing and limits what the lower ranking person is able to do." Dr. Mechanic was not aware of the facts of this case.

Dr. Mechanic testified regarding four different tactics of intimate partner violence: physical violence; emotional or psychological abuse, such as name calling and belittlement, isolation from friends and family, and being subject to other restrictions;

coercion, which can include coerced sex, forced sex, and being made to watch pornography; and harassment and stalking. These tactics are each used in the same way as tools of control and coercion to get the other person to comply with the wishes and demands of the abuser. Not all tactics appear in any given relationship and the tactics might change or evolve over time. Emotional or psychological abuse in particular might involve name calling and insults, undermining the victims' self-worth, limiting the victims' access to friends, family, or other sources of support, controlling social media connections, and restricting their contacts.

Victims of intimate partner violence and trauma may experience a reduced sense of value and erosion of their sense of self. A common misconception is that a person who suffers intimate partner violence will immediately make a police report. Victims might be humiliated or degraded, feel unsure as to whether an act is sexual assault based on prior consensual encounters or expectations of the relationship, or have learned from experience that if they do not go along with sex some other negative consequence will attach. Where there is coercion as opposed to physical battery, a victim might be confused about their obligations and what constitutes abuse.

Victims also may not report until they are out of the relationship and can identify what happened as a criminal act. Victims often stay in the relationship and hope they can "work it out" and "get back" to the better version of the partner they knew earlier in the relationship. It is not uncommon to see love and affection alongside abuse, coercion, and violence. Female victims of intimate partner violence often disconnect or disassociate the violence or abuse from the man who commits it. In the workplace context, there are "additional layers of complications" including risks to a person's career and the "cascading effects" of a disclosure on other coworkers, some of whom might align with the abuser. Abuse may not always be consistent or continuous, and there may be times that the relationship is "happy and positive."

19

### 3. Defense Testimony

Guenther testified that none of his sexual relations with Doe occurred by means of physical force, violence, or duress. When Doe first began working at SVI, he and she were "very professional." As they began working more closely, they "developed chemistry," he became flirtatious with her, and she "reciprocated a lot." One evening, they attended a business function together. After a few glasses of wine, they returned to the office, he kissed her, she kissed him back, and they began touching and "making out." He was aroused and it "got to the point where [he] unzipped his pants, and she proceeded to give [him] a blow job."

Guenther believes his relationship with Doe grew from infatuation into love over the summer and fall of 2018 as they spent more time together and became more intimate. Guenther expressed his desire to be in charge, sexually and romantically as well as at work and personally, and Doe expressed that she enjoyed submitting. The dominant/submissive feature of the relationship (though they never discussed it in those terms) developed to include certain expectations, including that Doe not go to sleep until Guenther told her good night and that she adore and praise him. They "experimented with almost every kind of sex imag[in]able" and "[u]sing different toys." Using crude language to talk about sex was "exciting" and part of their relationship "since almost day one." Guenther did not recall Doe ever expressing discomfort about the crude language.

Guenther gradually began drinking more as the relationship with Doe progressed and would often have "at least a half a bottle of scotch" most nights while sitting on the couch at home. By early October 2020, Guenther felt "more guilty about the relationship and drank more," leading to him to engage in more "verbal abuse" of Doe which "put a strain on things." He "wasn't in [his] right mind" when he sent her verbally abusive text messages. He would wake up the next day "mortified" at what he had done and would consistently apologize.

20

During his testimony, Guenther reviewed months of text messages with Doe. He described similar expressions of love and affection between himself and Doe in the messages after the charging date of September 6, 2020, as in the months prior. Doe also sent him sexually suggestive texts or pictures, like a photo in September 2020 of her doing laundry and hanging her thong underwear to dry, or in October 2020, she sent a selfie with her cat. Doe is clothed in the photo but her nipple is protruding, and she wrote, " 'Gave you some nipple there.' " Guenther had not told her to send those photos and believed it "show[ed] [him] that she was into the sexual aspect of [their] relationship, and she knew [he] would enjoy pictures like that." On October 18, 2020, which was not a workday, Guenther texted Doe at 7:44 a.m. saying " 'Good morning. I love you,' " to which she responded " 'Good morning. Love you, too,' " followed by " 'In me, please' " which Guenther understood as meaning that she wanted to have sex with him.

After the October 12 incident in which Guenther threw Doe's phone against the wall and she broke the orchid pot, Guenther thought there might be a way to "recover the relationship." He told her that he would meet her and quickly put together a "seven- or eight-bullet point list" of what he "thought would help [them] to have a better path forward." He printed it out because he is a "very organized person" and was "trying to come up with some sort of a formula . . . that might work, where [they] could move forward and have more success together." The list included that she would "love, adore, respect" and provide "words of affirmation" to Guenther, that she be given an extra hour of lunch break a day to exercise, which he viewed as a way to help her with her fitness and weight goals and be "less stressed in the workplace," that she masturbate daily, which she had told him was something she used to do and he wanted "to give her time to do that," and that their "personal relationship" would "continue in the same way" with morning and afternoon sex, watching shows, and hanging out. They agreed they would move forward and carry on with their daily routines and continued messaging each other.

21

Guenther had no intention of firing Doe. On November 18, Doe was running "quite late" and did not notify him until about 7:50 that she was not going to be there by 8:00 a.m. He told her she needed to give more warning since the other employees would be coming in to work and "[w]e have our normal routine." She arrived at 8:41 and they did their "normal routine" which at that time was a "blow job." Guenther left the office around 10:00 a.m. for his daily run then went home to rest. Though it was not his custom, he decided to check the office security cameras, which he had installed after several break-ins at the office complex. He "saw and heard" Doe talking with Stacy and "basically mocking" him. He asked Doe to call him from outside the office and told her what he had overheard. He realized then that he could "potentially lose another key manager" in Stacy and that as much as he loved and cared for Doe, his "trust had been broken." He decided he had to let her go.

After sending Doe on an errand and asking the rest of the staff to leave, Guenther called Doe to his office and "conducted a very simple exit interview" and terminated her employment. Guenther felt relieved that it was "finally done" but as the days passed he felt "more remorseful about what had happened." Guenther tried many times to reach Doe but she did not respond until he called her from a blocked phone number. He offered her money for two reasons—the first being that he "always felt that if [they] ever parted ways [he] wanted to take care of her," so he offered her money so she would not lose her house or be unable to pay bills. The second reason was that after he received the pretext call on December 1, 2020, he grew concerned that Doe might be talking to a lawyer for a potential "civil suit, or something like that." He contacted an employment lawyer and decided to offer her a severance package, which would give her some money and security and would include a release of liability for him. Guenther had no knowledge that she had gone to the police and it "[n]ever crossed [his] mind" that he had committed crimes and should try to pay her off.

22

On cross-examination, Guenther testified that when he texted Doe " '8 [a.m.] if you want your job' " on September 6, 2020, he was not in his "right mind" and had been "drinking heavily." Guenther acknowledged there were "many times" he made such statements about her job or pay but asserted it was "a little more complicated than that." Given the context of their relationship, he believed she consented to the acts that followed those communications. He "didn't require it. It was how [their] relationship evolved. [] [He] never made her do anything." Instances when she cried during sex acts "wasn't an indication to [Guenther], either" that the sex was not consensual or, for Doe, that the threats regarding salary and sex might have been related.

Guenther acknowledged that his name calling was demeaning and cruel. He denied that it "didn't matter" to him whether she wanted to engage in sex. He understood based on "many occasions" in which they spoke, dating back to May 2018, that she had "expressed her desire to be 100-percent submissive" to him and had chosen to do so "as a strong independent woman." He regretted every instance in which he was cruel to Doe but admitted it seemed like he could not stop. He admitted that he had threatened to fire her and had reduced her pay. He believed those threats were not consequential.

Doe would "from time to time" tell him there was a sex act she did not want to do, but she did not indicate that she did not want sex at all. Guenther only recalled "one time" that Doe expressed pain or discomfort from the sex acts but acknowledged other text messages in the record that referred to Doe's pain or discomfort from anal sex. She "seemed to enjoy it, that dynamic that [they] had."

## II. DISCUSSION

Guenther raises four issues on appeal. He contends that his convictions must be reversed because the evidence did not support jury instructions based on duress as the legal theory underlying Guenther's sections 286 and 287 convictions, which instead should have been resolved as a question of " 'threatening to retaliate' " under subdivision (c)(3) of those sections. Guenther also maintains that his mistake as to the issue of Doe's

consent to the sex acts did not need to be reasonable and could be based on an honest but unreasonable belief that her participation was voluntary.  Guenther next contends that because his belief Doe was participating consensually was the key issue at trial, the trial court erred in overruling the defense's objection to Doe providing her lay opinion that Guenther was not deluded as to the question of her consent.  Guenther lastly maintains that his sentence violates the constitutional prohibitions against cruel and/or unusual punishment.

### A.  Duress

Guenther argues that his convictions for oral copulation " 'by duress' " and sodomy " 'by duress' " are based on an erroneous application and interpretation of sections 287, subdivision (c)(2)(A) (hereafter, section 287(c)(2)(A)) and section 286, subdivision (c)(2)(A) (hereafter, section 286(c)(2)(A)).  Although Guenther's argument on this point is not entirely clear, he appears to contend that the Legislature did not intend the conduct for which he was convicted (i.e., requiring Doe to satisfy his demands for daily oral and anal sex as part of a dynamic in which he controlled her time, her personal relationships, and her financial security by threatening to eliminate her job and/or salary if she did not submit to him) to qualify as " 'duress' " under sections 287(c)(2)(A) and 286(c)(2)(A).  He contends that the threats to her employment and pay instead qualify as threats to retaliate, which are described in a different subdivision—namely sections 287, subdivision (c)(3) and 286, subdivision (c)(3).  Further, " 'threatening to retaliate' " is specifically defined to encompass only " 'a threat to kidnap or falsely imprison, or inflict extreme pain, serious bodily injury, or death' " (§ 287, subd. (*l*); see also § 286, subd. (*l*)).  Guenther states that he "was prosecuted under the wrong subdivisions of sections 286 and 287, where there was insufficient evidence to convict him under the right subdivision."

24

1. <u>Additional Background</u>

The prosecution charged Guenther with oral copulation pursuant to section 287(c)(2)(A) and sodomy pursuant to section 286(c)(2)(A), alleging that Guenther accomplished each of these acts "against the will of the victim, Jane Doe, by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury."

In discussions about the proposed jury instructions, Guenther's counsel acknowledged the prosecution's theory of the charged offenses "is duress" and stated that the defense was "fine with just duress being instructed to the jury as a means of the sexual assault under the theory in this case." The parties ultimately agreed that the trial court omit the force, violence, and menace language from those instructions to avoid confusing the jury, and refer only to " 'oral copulation by duress' " and " 'sodomy by duress.' " Regarding the definition of " 'duress,' " the prosecution suggested retaining and not altering the CALCRIM language. However, the trial court adopted defense counsel's suggestion to omit those parts of the CALCRIM No. 1015 (oral copulation by force, fear, or threats) definition that do not apply under the theory pursued at trial (such as threat of force, violence, danger, hardship) and define duress as "a direct or implied threat of retribution," further giving the example of retribution provided in the model instruction. The parties interposed no objections to the court's decision regarding the use of CALCRIM No. 1015 and agreed to the same language and definition of duress for the sodomy instruction using CALCRIM No. 1030.

The trial court instructed the jury, as to counts 1 through 10, with CALCRIM No. 1015, "oral copulation by duress" in violation of section 287(c)(2)(a), and as to counts 11 through 20, with CALCRIM No. 1030, "sodomy by duress" in violation of section 286(c)(2)(a). The court instructed the jury that to prove the defendant guilty of oral copulation by duress, "the People must prove that, one, the defendant committed an act of oral copulation with someone else. Two, the other person did not consent to the act. And, three, the defendant accomplished the act by duress. . . . [¶] Duress means a

25

direct or implied threat of retribution that causes a reasonable person to do or submit to something that he or she would not, otherwise, do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant. Retribution is a form of pay back or revenge."

The trial court used the same language on "duress" and "threat of retribution" to instruct the jury on the charges of "sodomy by duress": "To prove that defendant is guilty of this crime, the People must prove that, one, the defendant committed an act of sodomy with someone else. Two, the other person did not consent to the act. And, three, the defendant accomplished the act by duress. Sodomy is any penetration, no matter how slight, of the anus of one person by the penis of another person. Ejaculation is not required. . . . [¶] Duress means a direct or implied threat of retribution that causes a reasonable person to do or submit to something that he or she would not, otherwise, do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant. Retribution is a form of pay back or revenge."

Both instructions also included language on the reasonable mistake of fact defense, discussed in our analysis, *post* (pt. II.B.).

       2. Applicable Law

Sections 286 and 287 define the offenses of sodomy and oral copulation, including against minors, and against persons of any age when accomplished against that person's will. Section 286(c)(2)(A) and section 287(c)(2)(A) proscribe acts of sodomy and oral copulation, respectively, when "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." The statutes do not define "duress." The penalty for violation of these provisions is "imprisonment in the state prison for three, six, or eight years." (§§ 286(c)(2)(A), 287(c)(2)(A).)

26

Sections 286 and 287 also proscribe acts of sodomy and oral copulation "where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat. . . ." (§§ 286, subd. (c)(3), 287, subd. (c)(3).) Sodomy and oral copulation by "threatening to retaliate" each carries the same penalty triad as those offenses when accomplished by duress. (§§ 286, subd. (c)(3), 287, subd. (c)(3).) The statutes define " 'threatening to retaliate' " as "a threat to kidnap or falsely imprison, or inflict extreme pain, serious bodily injury, or death." (§§ 286, subd. (*l*), 287, subd. (*l*).)

The CALCRIM instructions for alleged violations of these offenses are CALCRIM Nos. 1015 and 1030. CALCRIM No. 1015 addresses "oral copulation by force, fear, or threats" (capitalization omitted), including under section 287, subdivision (c)(2) and (3). CALCRIM No. 1030 addresses "sodomy by force, fear, or threats" (capitalization omitted), including under section 286, subdivision (c)(2) and (3). Both utilize the same language as is relevant to our analysis for describing the elements of the offenses based on (1) commission of the act (oral copulation, or sodomy, as defined), (2) lack of consent of the other person, and (3) means of accomplishing the act – whether "by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person" as set forth in the bracketed "Alternative 3A," or "by "threatening to retaliate against someone when there was a reasonable possibility that the defendant would carry out the threat," as set forth in the bracketed "Alternative 3B." (CALCRIM No. 1030; see also CALCRIM No. 1015.)

The CALCRIM instructions define "[d]uress" to mean "a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do [or submit to] something that he or she would not otherwise do [or submit to]. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and (his/her) relationship to the defendant."

27

(CALCRIM No. 1015; see also CALCRIM No. 1030.) The CALCRIM instructions further define "[r]etribution" as "a form of payback or revenge." (CALCRIM No. 1015; see also CALCRIM No. 1030.) Consistent with the definitions set forth in subdivision (*l*) of sections 286 and 287, the CALCRIM instructions define "threat of retaliation" as used in "Alternative 3B" to mean "a threat to kidnap, unlawfully restrain or confine, or inflict extreme pain, serious bodily injury, or death." (CALCRIM No. 1015; see also CALCRIM No. 1030.)

### 3. Analysis

Guenther challenges the trial court's instruction to the jury on duress, both as to the sodomy and oral copulation counts, as well as the prosecutor's election to proceed under that theory, rather than under the theory that the acts were accomplished by threat of retaliation in violation of sections 287, subdivision (c)(3) and 286, subdivision (c)(3). He contends that despite his defense counsel's failure to object to the instruction on these grounds, the issue is preserved because the trial court has a sua sponte duty to correctly instruct the jury as to the elements of the offense. He further maintains that the failure to object was due to ineffective assistance of counsel "in failing to ensure a prosecution under the correct subdivisions" of sections 286 and 287.

The Attorney General counters that the district attorney properly exercised prosecutorial discretion in this case to charge Guenther with oral copulation pursuant to section 287(c)(2)(A) and sodomy pursuant to section 286(c)(2)(A), which in any event carry the same penalties (three, six, or eight years) as conduct charged under sections 287, subdivision (c)(3) and 286, subdivision (c)(3). The Attorney General argues that where two statutes proscribe the same conduct (as Guenther appears to suggest based on the facts of this case), a prosecutor may generally elect to proceed under either statute unless the Legislature has clearly indicated a contrary intent. (See *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1250–1252.)

28

To the extent that Guenther purports to challenge the district attorney's charging decision, Guenther has not shown any ground for error. "It is well settled that the prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring." (*People v. Birks* (1998) 19 Cal.4th 108, 134; accord, *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 552.) "This prosecutorial discretion to choose, for each particular case, the actual charges from among those potentially available arises from ' "the complex considerations necessary for the effective and efficient administration of law enforcement." ' " (*Birks*, at p. 134.) "The courts do not generally supervise these 'purely prosecutorial function[s].' " (*People v. Ceja* (2010) 49 Cal.4th 1, 7, citing *Birks* at p. 134.)

The district attorney elected to charge Guenther under sections 287(c)(2)(A) and 286(c)(2)(A) and tried the case under the theory of duress set forth in those subdivisions. Guenther did not object to the jury instructions on the elements of oral copulation and sodomy accomplished by means of duress. Nevertheless, because the alleged error goes to an element of the crime (i.e., the means by which the defendant accomplished the charged sex act), we conclude his claim on appeal is reviewable. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1377–1378; *People v. Mason* (2013) 218 Cal.App.4th 818, 823.)

We turn to Guenther's principal argument that the trial court misinstructed the jury because the prosecution's theory of the case constituted " 'threatening to retaliate' " under subdivision (c)(3) of sections 286 and 287 rather than " 'duress' " under sections 286(c)(2)(A) and 287(c)(2)(A).

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) "The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) "We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as

a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

To decide what the relevant law provides in this context, we look to the statutory provisions on sodomy and oral copulation "by duress." Our goal in interpreting these provisions " 'is to ascertain and effectuate legislative intent.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1007 (*Leal*).) " '[W]e turn first to the words of the statute[s] themselves, recognizing that "they generally provide the most reliable indicator of legislative intent." [Citations.] When the language of a statute is "clear and unambiguous" and thus not reasonably susceptible of more than one meaning, " ' " 'there is no need for construction, and courts should not indulge in it.' " ' " ' " (*Ibid.*) As with our review of the jury instructions, we consider questions of statutory interpretation de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

For our purposes, the same statutory analysis applies to the sodomy and oral copulation statutes, which, but for the distinct physical acts, describe identical violations accomplished by identical means. (See *People v. Hale* (2012) 204 Cal.App.4th 961, 978–979 (*Hale*) [noting that "aside from the definition of and references to the particular sexual act (i.e., sodomy or oral copulation), the oral copulation statute . . . is *identical* to the sodomy statute at issue here"].) The law describes the various means by which a person may violate section 286 and/or 287, including by engaging in the specified acts of sodomy and/or oral copulation "against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§§ 286(c)(2)(A), 287(c)(2)(A).)

Courts have defined the "duress" element in these statutes "as 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have

30

submitted.' " (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*); accord *Hale*, *supra*, 204 Cal.App.4th at p. 979.)

This definition originated in *People v. Pitmon* (1985) 170 Cal.App.3d 38 (*Pitmon*), disapproved of in part on another ground by *People v. Soto* (2011) 51 Cal.4th 229 (*Soto*). *Pitmon* involved lewd and lascivious acts with a child under 14 years of age by means of force or duress (§ 288, subd. (b)). (*Pitmon*, *supra*, at pp. 43–44.) To provide a legal definition for duress in the context of the sex offenses, the *Pitmon* court looked to the commonly understood meaning of duress. (*Id*. at pp. 48–49.) The court declined to restrict the definition to that used for the *defense* of duress (see § 26) and focused on those aspects of the common definition not already encompassed by the other listed elements in the subdivision (like force and threat of great bodily harm) to avoid rendering "duress" surplusage. (*Pitmon*, at p. 50.) It explained that the "total circumstances" including age and relationship of the victim to the defendant must be considered in evaluating whether duress caused the victim to perform or acquiesce in the charged act. (*Id*. at p. 51.)

The California Supreme Court in *Leal* approved of courts' longstanding reliance on the definition articulated in *Pitmon*, which by then had "been incorporated in the standard jury instruction" for various sex crimes other than rape or spousal rape.[11] (*Leal*,

---

[11] In 1990, the Legislature expanded the definition of rape to include acts accomplished by "duress." (*Leal*, *supra*, 33 Cal.4th at pp. 1005–1006.) It adopted the same definition of "duress" as that used by the courts and derived from the Court of Appeal decision in *Pitmon*, *supra*, 170 Cal.App.3d 38. (*Leal*, at pp. 1005–1006.) In 1993, the Legislature "rewrote the spousal rape law to define 'spousal rape' in terms similar to the definition of 'rape' " (*id*. at p. 1006) and, in so doing, amended the definition of " 'duress' " to delete the term " 'hardship' " and used the amended definition in both the rape and rewritten spousal rape statutes. (*Ibid*.) These statutory amendments, which removed the term " 'hardship' " from the definition of " 'duress' " in rape and spousal rape, "did not alter the previously existing judicial definition of the term 'duress' as used in Penal Code section 288, subdivision (b)(1), which did, and continues to, include a threat of hardship." (*Id*. at pp. 1001–1002, 1009.) Because "threat of

31

*supra*, 33 Cal.4th at p. 1004 [noting "[t]he *Pitmon* definition of 'duress' has been followed consistently for almost 20 years"]; *id*. at p. 1005 [and was used to define " 'duress' " in numerous cases involving specified sex offenses].) The court viewed the definition as consistent with the purpose of " 'giv[ing] effect to statutes according to the usual, ordinary import of the language used.' " (*Id*. at p. 1009.) It rejected applying the more limited definition of " 'duress' " used in the rape and spousal rape statutes to the " 'duress' " element of the lewd and lascivious acts charged in that case, explaining "[t]he Legislature might well have wished to apply a somewhat broader definition of 'duress' in cases involving sexual abuse of a child under the age of 14 years." (*Id*. at p. 1008.)

The high court in *Soto* reiterated its holding in *Leal* concerning the definition of " 'duress' " in cases involving an aggravated lewd act against a child. (*Soto*, *supra*, 51 Cal.4th at p. 246.) In holding that "the victim's consent is not a defense to the crime of lewd acts on a child under age 14 under any circumstances" (*id*. at p. 233), the court explained that "[b]ecause duress is measured by a purely objective standard, a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior." (*Id*. at p. 246.)

We recognize that *Leal* and *Soto* each addressed the definition of "duress" in the context of crimes perpetrated against children, and neither concerned the specific statutes at issue here. However, we reject the implication that because cases addressing the definition of " 'duress' " have involved crimes against children, the use of the same definition in cases involving crimes against nonminors is unsupported. Guenther provides no legal argument or authority to suggest a different meaning of " 'duress' "

---

hardship" is not part of the definition of "duress" supplied to the jury in this case, this history does not affect our analysis.

applies when the sex offense victim is an adult.[12] The statutory language does not itself make any such distinction. As the court observed in *Soto*, "[t]hat the definition [of duress] was formulated in the context of a different legal issue does not make it irrelevant to the question we explore here." (*Soto*, *supra*, 51 Cal.4th at p. 246, fn. 10.)

The statutes utilize the same language for an act "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" to describe offenses against nonminor and minor victims of aggravated sexual assault but impose increased penalties for offenses against minor victims. (See, e.g., § 287, subds. (c)(2)(A) [oral copulation accomplished against nonminor victim's will "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" made punishable by imprisonment for three, six, or eight years], (c)(2)(B) [oral copulation "by means of force, violence, duress, menace, or fear" upon a victim under 14 years made punishable by eight, 10, or 12 years' imprisonment], and (c)(2)(C) [oral copulation "by means of force, violence, duress, menace, or fear" upon a minor 14 years of age or older made punishable by six, eight, or 10 years' imprisonment].) Looking to the words of the statutes as " ' "the most reliable indicator of legislative intent" ' " (*Leal*, *supra*, 33 Cal.4th at p. 1007), we perceive no basis for applying a different definition of "duress" as between the two types of cases. We conclude that absent contrary indication in the statutory language or case law, our high court's use of the *Pitmon* definition of "duress" in child victim cases supports the application of that definition to the same statutory language ("by means of force,

---

[12] We note there is at least one published decision that has applied the same instruction and definition of "duress" to violations involving both minor and nonminor victims. (See *People v. Cardenas* (1994) 21 Cal.App.4th 927, 930 (*Cardenas*) [affirming the defendant's convictions by means of duress against an adult victim (on sexual penetration count (§ 289, subd. (a)) and a child victim (on forcible lewd act counts (§ 288, subd. (b))].)

violence, duress, menace, or fear of immediate and unlawful bodily injury") applicable here.

Courts have long recognized that duress can arise in a variety of ways related to psychological and/or situational factors between the perpetrator and victim. In *Schulz*, a case involving multiple counts of sexual molestation of a child under section 288, a panel of this court explained that use of the term " '[d]uress' " "would be redundant in the cited statutes if its meaning were no different than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily injury.' " (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005.) *Schulz* recognized that "duress involves psychological coercion." (*Ibid.*) " 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*Ibid.*; see also *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072–1073 [child compelled to participate in sex acts in response to the defendant's position of parental authority and implied threat of violence].) Similarly, in *Cardenas*, the appellate court rejected the defendant's contention that because his victims believed he was a "curandero" (faith healer), they "voluntarily submitted themselves" to his treatments. (*Cardenas*, *supra*, 21 Cal.App.4th at p. 937.) The court noted that the defendant's argument "ignore[d] the evidence relating to the psychological and physical deprivations he imposed upon all of his victims to coerce them to submit to specific treatments against their will." (*Id.* at p. 938.)

These principles translate readily to other circumstances involving an uneven power dynamic between a victim and perpetrator inhabiting a position of authority. While the "relative ages and sizes" (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005) of the perpetrator and victim may not be as relevant to proving psychological compulsion or duress where, as here, the victim is an adult, other factors related to " 'the position of dominance and authority of the defendant' " (*ibid.*) remain salient. The trial court therefore did not err in instructing the jury based on CALCRIM Nos. 1015 and 1030 that

"[d]uress" means "a direct or implied threat of retribution that causes a reasonable person to do or submit to something that he or she would not, otherwise, do or submit to" and "[w]hen deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant."

In arguing that the trial court erred in its instructions to the jury on the charged crimes, Guenther's statutory argument rests almost entirely on the canon against surplusage. He contends that, if duress under sections 286(c)(2)(A) and 287(c)(2)(A) encompasses " 'threatening to retaliate in the future,' " then sections 286, subdivision (c)(3) and 287, subdivision (c)(3) (and the related narrow definitions of retaliation in subdivision (*l*) of sections 286 and 287) "have been rendered statutory 'surplusage.' "

"However, ' "the canon against surplusage is [merely] a guide to statutory interpretation and is not invariably controlling." ' " (*People v. Reynoza* (2024) 15 Cal.5th 982, 992.) Subdivision (c)(3) of sections 286 and 287, as further defined by subdivision (*l*) of those sections, applies to specific threats of future (and therefore nonimmediate) kidnapping, extreme pain, serious bodily injury, or death, whether against the victim or a third person. These consequences are not necessarily covered by subdivision (c)(2)(A) of those same sections. (Compare §§ 286, subd. (c)(3) and 287, subd. (c)(3), italics added [criminalizing sodomy and oral copulation, respectively, "where the act is accomplished against the victim's will by threatening to retaliate *in the future* against the victim *or any other person*"], with §§ 286(c)(2)(A) and 287(c)(2)(A), italics added [criminalizing the same acts, respectively, "when the act is accomplished against the victim's will *by means of* force, violence, *duress*, menace, *or fear of immediate* and unlawful bodily injury on the victim or another person"].) The arguable overlap between the duress and threatening-to-retaliate provisions does not render the specified future threats surplusage where such threats (including against third persons) would not invariably come under the provision for duress. For example, an act of sodomy accomplished against the victim's will by a

35

threat to kidnap some other, unknown person in the future might constitute a violation of section 286, subdivision (c)(3) if there is merely a "reasonable possibility" that the perpetrator will execute the threat, whereas that same threat might not amount to duress under section 286(c)(2)(A). By contrast, an act of sodomy accomplished against the victim's will by threatening to expose a humiliating affair (or some other form of immediate psychological retribution) might constitute duress under section 286(c)(2)(A) but might not come within the meaning of threats of future retaliation under section 286, subdivision (c)(3).

We therefore disagree with Guenther that the term " 'retribution' " (as used in the judicially approved definition of " 'duress' ") and the statutory violation based on "threatening " 'retaliation' " are, as he contends, "identical" in meaning. This argument might be persuasive in the absence of a specific statutory definition but falls short where the statute uses " 'threatening to retaliate' " to refer specifically to future threats as enumerated in the statute and including threats against others. (§ 287, subd. (*l*) [defining " 'threatening to retaliate' " as " 'a threat to kidnap or falsely imprison, or inflict extreme pain, serious bodily injury, or death' "]; see also § 286, subd. (*l*).)

By contrast, "duress" as a means of accomplishing the sex acts in sections 286 and 287 can apply under a range of circumstances where the duress—as with the other listed terms of force, violence, menace, or fear of immediate and unlawful bodily injury— enables the accomplishment of the act against the victim's will. (§§ 286(c)(2)(A), 287(c)(2)(A).) Courts have applied the concept of "duress" as used in these statutes broadly, consistent with the definition articulated in *Pitmon* and with the common meaning of the term " 'duress.' " (See, e.g., *Schulz*, *supra*, 2 Cal.App.4th at p. 1005; *Leal*, *supra*, 33 Cal.4th at pp. 1004–1005.) For example, in *Cardenas*, the defendant and self-professed *curandero* warned his 26-year-old victim that she was very ill and would die if she did not accept his "cure" (which in part involved him requiring her to undress and for him to insert his fingers into her vagina). (*Cardenas*, *supra*, 21 Cal.App.4th at

36

p. 933.) The threat of future retribution (continued illness and death), combined with other coercive conduct with more contemporaneous application, like the defendant telling the victims not to go near the windows because bad spirits would throw them out, and not to leave the apartment or they would be killed (*id*. at p. 936), created an environment of psychological and physical control. These acts were sufficient to cause the victims to submit to his sexually assaultive "treatments" and supported his criminal convictions on the theory of duress. (*Id*. at p. 938.)

Thus, "duress" as a means of accomplishing the sodomy or oral copulation can ensue from "psychological coercion" stemming from " 'the position of dominance and authority of the defendant and his continuous exploitation of the victim.' " (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005.) A direct or implied threat of retribution that carries immediate consequences due to the power disparity, or dynamic of control and coercion, between the victim and defendant, which causes a victim to acquiesce or participate in an otherwise unwanted sex act, is distinct from a specific threat of future retaliation in the form of kidnapping or serious bodily injury or death, as defined in sections 286, subdivisions (c)(3) and (*l*) and 287, subdivisions (c)(3) and (*l*). Unlike a violation of section 286 or 287 based on subdivision (c)(3), neither the subject matter of the threatened retribution nor its timing is determinative of a section 286(c)(2)(A)/ 287(c)(2)(A) violation.

Moreover, "duress" as long defined by the courts implies a reasonable person standard, requiring proof that the threatened retribution was sufficient to coerce a reasonable person of ordinary susceptibilities to submit to the sexual act. (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005; *Leal*, *supra*, 33 Cal.4th at p. 1004.) The retaliation provision, however, does not require consideration of the reasonable person standard. Instead, the retaliation provision (§§ 286 & 287, subds. (c)(3) and (*l*)) effectively assumes coercion based on the presence of those specific threats when there is a reasonable possibility the

future threat will be carried out. Because the provisions have distinct elements, neither "duress" nor "retaliation" in these statutes constitutes statutory surplusage.

The legislative history of these provisions further demonstrates that the duress and retaliation provisions were intended to address distinct forms of coercive conduct and therefore may be harmonized. (*People v. Superior Court* (*Ortiz*) (2022) 81 Cal.App.5th 851, 863 (*Ortiz* ) ["It is incumbent upon courts to harmonize statutes based on their texts, if that can reasonably be done."].) In 1985, the Legislature added "threatening to retaliate" to the language describing sodomy and oral copulation violations "accomplished against the victim's will" by means including duress "or where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable probability that the perpetrator will execute the threat." (Stats. 1985, ch. 1085, §§ 2, 5.) The Legislature added the subdivisions defining "threatening to retaliate" consistent with the current definition (*ibid*. [adding then-subdivision (i) defining "threatening to retaliate"]) and later split "threatening to retaliate" into its own subdivision. (Stats. 1998, ch. 936, §§ 4, 5 [creating subdivisions (c)(1), (c)(2), and (c)(3)].) These changes to the statute occurred concurrent with courts' adoption of the *Pitmon* definition of "duress" but did not alter the treatment of "duress" in the statutes.[13]

Guenther asserts that in making these changes, the Legislature intended violations based on threats of future retaliation to be prosecuted under the retaliation provision (§§ 286, subd. (c)(3), 287, subd. (c)(3)) and not under duress (§§ 286(c)(2)(A), 287(c)(2)(A)). He is essentially arguing that the addition of the retaliation provision implicitly repealed, in part, the duress element of the violation, where duress is based upon future threats of retaliation, as opposed to threats of contemporaneous harm. This interpretation ignores the differences outlined above, including that threats not

---

[13] *Pitmon*, *supra*, 170 Cal.App.3d 38, was decided in 1985.

constituting "retaliation" as defined in subdivision (*l*) of sections 286 and 287 (i.e., threats of economic or psychological retaliation, whether future or immediate) may nonetheless constitute threatened retribution sufficient to cause a person of reasonable susceptibilities to engage in the sex act against their will, i.e., duress. Guenther's interpretation also contravenes the presumption against repeals by implication. (See, e.g., *Ortiz*, *supra*, 81 Cal.App.5th at p. 863; *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 419; cf. *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038.) We are not persuaded that the legislative history of these provisions supports Guenther's contention that he was prosecuted under the "wrong subdivisions" of sections 286 and 287. Nor has Guenther pointed to any other aspect of the legislative history that sheds additional light on the legislative intent behind the changes to the sodomy and oral copulation statutes that would support excluding the charged conduct from prosecution under the "duress" provision of sections 286 and 287.

For these reasons, we conclude that the subdivisions are not duplicative and do not render the other surplusage. The trial court therefore did not err in instructing the jury, based on "all the circumstances," that "[d]uress means a direct or implied threat of retribution that causes a reasonable person to do or submit to something that he or she would not, otherwise, do or submit to."

The prosecution framed its case against Guenther using the broader conception of duress in sections 286(c)(2)(A) and 287(c)(2)(A), rather than retaliation as used in sections 286, subdivision (c)(3) and 287, subdivision (c)(3).[14] The prosecutor's closing argument highlighted duress arising not only from Guenther's express and implied threats

---

[14] Because the prosecution's theory of duress—and the supporting evidence—went beyond mere threats of retaliation, we need not address whether conduct limited solely to future threats must be charged under sections 286, subdivision (c)(3) and 287, subdivision (c)(3).

of retribution concerning Doe's position and pay at SVI but, more broadly, his exercise of control over other facets of Doe's life. The prosecutor argued, "There were times over the course of these two to three years where Mr. Guenther demanded sex, but did not threaten anything. There were times when he threatened Ms. Doe, but didn't demand sex. He threatened her a lot over a lot of things, because he wanted to control everything. This case bec[a]me[] criminal when he threaten[ed] her over sex to service him."

The prosecutor pointed out various coercive elements of Guenther's control over Doe. These elements included Guenther's exploitation of Doe's financial vulnerability— including requiring her to give up her other sources of income and his thinly veiled warnings and reminders that she was still in debt. They also included Guenther's control over the time and type of sex (e.g., "scheduled oral copulation and scheduled sodomy"), his cruelty toward and verbal abuse of Doe, which the prosecutor argued "extended to her intelligence, her life choices, her body image, her intelligence, her finances . . . [and] to demeaning her sexually," and his demand to control other elements of Doe's life, including when she went to sleep, with whom she associated, what she posted on social media, and even how much she exercised and masturbated.

The prosecutor identified the "cumulative effect" of these factors, "like a snowball," as context for understanding Guenther's threats of retribution, which the prosecutor argued "came so repeatedly" that they formed "a continuous pattern of conduct" in which each threat "amounted to more duress and more coercion and influence over her to make her do it again and again." Ultimately, the prosecutor argued that the threat of retribution flowed from the entire dynamic of control that Guenther had established, wherein Doe wanted to keep her job and Guenther "threatened to take that away" as "revenge for not doing what he demanded her to do" and "pay back for not obeying his orders."

These arguments illustrate that the prosecution's theory of duress based on recurring threats of retribution and psychological coercion arose from Guenther's

40

" 'position of dominance and authority . . . and his continuous exploitation' " (*Schulz*, *supra*, 2 Cal.App.4th at p. 1005) of Doe's status as Guenther's employee.  Further, the evidence of Guenther's pervasive verbal abuse and debasement of Doe, his reprimands and ridicule when she failed to meet his expectations for submission and fulfillment of his sexual demands, his insistence that he control when she slept, how she communicated with him, and with whom she associated, and the threats (both express and implied) he made regarding Doe's job, pay, and future employability, combined to create an environment in which Doe reasonably feared retribution if she did not submit to the daily requirements of oral and anal sex.  The prosecution had the legal authority to frame its case against Guenther in these terms (see *Birks*, *supra*, 19 Cal.4th at p. 134), and elicited ample supporting evidence.

We decide that, because the duress alleged by the prosecution comprised more than mere threats of future retaliation as set forth in section 287, subdivision (c)(3) and 286, subdivision (c)(3), the trial court did not err in instructing the jury as to the elements of oral copulation and sodomy "by duress" as set forth in section 287(c)(2)(A) and section 286(c)(2)(A) using the language of CALCRIM Nos. 1030 and 1015.

### B. *Mistake of Fact*

Guenther contends the trial court erred in instructing the jury with the mistake of fact portion of CALCRIM Nos. 1015 and 1030.  That part of the instruction uses the same language for both sex offenses, changing only the portion that reads "oral copulation" (as to CALCRIM No. 1015) or "sodomy" (as to CALCRIM No. 1030).  The court instructed the jury as follows:  "The defendant is not guilty of oral copulation by duress if he actually and reasonably believed that the other person consented to the act.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the person consented."  Further, "The defendant is not guilty of sodomy by duress if he actually and reasonably believed that the other person consented to the act.  The People have the burden of proving beyond a reasonable

41

doubt that the defendant did not actually and reasonably believe that the person consented."

Guenther acknowledges that the California Supreme Court has stated in the context of sex offenses that a defendant's mistake of fact defense as to the victim's consent—often called the *Mayberry* defense—must be objectively reasonable. (See *People v. Maury* (2003) 30 Cal.4th 342, 424; *People v. Williams* (1992) 4 Cal.4th 354, 360–361 (*Williams*); *People v. Mayberry* (1975) 15 Cal.3d 143, 155 (*Mayberry*).)

Nevertheless, Guenther contends that the statutory basis for the mistake of fact defense does not require the defendant's mistaken belief to be reasonable. He asserts that section 26 requires only that the mistaken belief preclude the criminal intent required for the crime, not that the mistaken belief be reasonable. Guenther argues there is no sound reason based on the rationale underlying the mistake of fact defense to impose a reasonableness requirement, since a defendant lacking the requisite mens rea, or criminal intent, generally cannot be convicted of a crime. (See § 20; *In re A.L.* (2019) 38 Cal.App.5th 15, 20 ["Wrongful intent is fundamental to virtually all criminal offenses."].) Guenther thus maintains that the mistake of fact defense can be based on an honest but unreasonable belief that the victim consented to the acts, and it was error for the trial court to instruct that the mistaken belief must be reasonable.

Guenther's arguments ask us to depart from longstanding Supreme Court precedent. As the court explained in *Williams*, the *Mayberry* defense "is predicated on the notion that under section 26, reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent." (*Williams*, *supra*, 4 Cal.4th at p. 360, fn. omitted.) There are two components to the defense, "one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. . . . [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus,

42

regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, *that belief must be formed under circumstances society will tolerate as reasonable* in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Id.* at pp. 360–361, italics added.)

The rationale behind the defense applies equally to other sex offenses, including those at issue here. Section 26 states that "[a]ll persons are capable of committing crimes except . . . [¶] . . . [¶] [p]ersons who committed the act . . . charged under an ignorance or mistake of fact, which disproves any criminal intent." In *Mayberry*, the court extended the application of the defense from a statutory rape case to other offenses, noting that "its rationale applies equally to rape by means of force or threat ([] § 261, subd. [(a)]2 & 3) and kidnaping ([] § 207)." (*Mayberry*, *supra*, 15 Cal.3d at p. 155.) The court rejected the argument that those statutory provisions "expressly []or by necessary implication negate the continuing requirement that there be a union of act and wrongful intent." (*Ibid.*)

Moreover, our Supreme Court has explained that the rationale requiring a defendant's mistaken belief to be objectively reasonable in order for the defense to operate applies even in cases, much like this one, "in which there is evidence of equivocal conduct that could be reasonably and in good faith relied on to form a mistaken belief of consent, but also evidence that this equivocal conduct occurred only after the defendant's exercise or threat of 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*Williams*, *supra*, 4 Cal.4th at p. 364.) The court emphasized, "No doubt it would offend modern sensibilities to allow a defendant to assert a claim of reasonable and good faith but mistaken belief in consent based on the victim's behavior after the defendant had exercised or threatened 'force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*Ibid.*) In such cases, the Supreme Court recommended that the trial court further instruct the jury "that a reasonable mistake of fact may not be found if the jury finds that such equivocal conduct on the part of the victim was the product of 'force,

43

violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*Ibid.*)

These statements by the California Supreme Court leave no ambiguity concerning the application of the mistake of fact defense where there is evidence that the defendant used "force, violence, duress, menace or fear" of bodily injury to accomplish the sex act and evidence of arguably equivocal conduct by the victim concerning her or his consent to the sexual act. (*Williams*, *supra*, 4 Cal.4th at p. 364.) It is well settled that the defense consists of an "objective component" asking whether the defendant's mistake regarding consent was reasonable under the circumstances. (*Id*. at p. 360.) Because Guenther's claim of error is foreclosed in this court by our Supreme Court's precedent, we must deny it. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### C.  Lay Witness Opinion Testimony

Guenther asserts the trial court erred in overruling the defense's objection to Doe providing her opinion that Guenther had not believed she was consenting, where the issue of Guenther's good faith and reasonable belief as to Doe's consent was a key issue to be resolved by the jury. He maintains that Doe's testimony constituted improper opinion evidence as to another's state of mind, exceeding the limits of lay witness testimony under Evidence Code section 800.

The Attorney General responds that the claim of error is forfeited due to Guenther's failure to object to the testimony on that basis at trial. The Attorney General alternatively maintains that the court did not abuse its discretion by admitting the opinion evidence and, in any event, any error in admitting the testimony was harmless given the other substantial evidence on which the jury assessed Guenther's guilt.

#### 1.  Additional Background

During Doe's redirect examination, the prosecutor asked questions to clarify Doe's earlier testimony that she had told Guenther "many times" that she did not want to continue the sexual relationship and only wanted to continue the professional

relationship.  Defense counsel objected to this line of questioning at various points based on "speculation" and "includes facts not in evidence."

After a sidebar conference with the trial court, the prosecutor asked Doe whether she informed Guenther "in person" that she did not want to continue the sexual relationship.  Doe confirmed she had expressed that to him in October and November of 2020, directly and through texts.  This exchange followed the sidebar conference: "[Prosecutor]:  [Were] there any other ways that you let him know that you didn't want to continue the sexual relationship?  [¶]  [Doe:]  Yes.  [¶]  [Prosecutor:]  How?  [¶]  [Doe:]  Body language.  Sounds, I guess, like, sighs of reluctance.  Just uninterest or disinterest.  Annoyance.  [¶]  [Prosecutor:]  Now, I want to come back to the question.  As of September of 2020, despite those behaviors and body language, and despite the things you told him in text, or even said to him in person, you were also saying, 'I love you,' and saying affectionate things that you thought was required; correct?  [¶]  [Doe:]  Yes.  [¶]  [Prosecutor:]  Did you think he was fooled, based on your communication with him?  [¶]  [Doe:]  I do not believe he was fooled."

The prosecutor again asked Doe to clarify, "Do you think that, based on your experience in September and October and November, he was fooled or under the delusion that you were in love with him and wanting to participate in these sex acts?"  Defense counsel objected that the question called for speculation as to Guenther's state of mind, and the prosecutor countered that the testimony was "only based on what [Doe] observed."  This colloquy ensued:  "[Trial court:]  Don't speculate.  If you can answer the question based on your observations and your experience, you may answer, but don't speculate.  [¶]  [Doe:]  Okay. Based on my experience and what I knew of him and the history of how things had gone on, if he was—if I had fooled him, there would not be requirements to show these external acts of submission that he was requiring.  [¶] [Prosecutor:]  And based on that, do you think he was fooled?  [¶]  [Doe:]  No."

## 2. Applicable Law

" ' "A lay witness may express opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code § 800, subd. (b)), 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" [Citation.] Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on "subtle or complex interactions" between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. [Citations.] A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. [Citation.] . . . A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion.' " (*People v. Sanchez* (2016) 63 Cal.4th 411, 456 (*Sanchez*).)

Generally, a "trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756; see Evid. Code, § 353.) The specific objection requirement "must be interpreted reasonably, not formalistically." (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).) Its purpose is "that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*Id.* at p. 435.)

## 3. Analysis

We begin with whether Guenther's claim of error has been forfeited due to his defense counsel's failure to object to Doe's testimony on the ground of improper opinion testimony. We agree with Guenther that the two objections interposed by defense counsel—one earlier in the redirect (prior to the sidebar conference between counsel and

46

the trial court), and the second shortly before the prosecutor rested—were adequate to inform the trial court and parties of the reasons that the defense believed the testimony should be excluded. (*Partida*, *supra*, 37 Cal.4th at p. 435.)

Although defense counsel did not object to the prosecutor's initial question, after the sidebar conference, about whether Doe believed Guenther was "fooled" by her shows of affection and expressions of love, defense counsel did object to the prosecutor's attempt to further question Doe about whether she "think[s]" based on her experience during the charging period that Guenther "was fooled or under the delusion that [she] w[as] in love with him and wanting to participate in these sex acts?" Defense counsel objected on the ground that the question "[c]alls for speculation as to [] Guenther's state of mind."

We recognize the Attorney General's point that a "speculation" objection differs from the argument Guenther makes on appeal regarding improper lay opinion testimony. The Attorney General argues that the trial court's admonishment of the witness not to speculate and to answer the question, if she can, based on her observations and experience, was responsive to the defense objection but did not consider the propriety of the testimony under the standards for lay opinion evidence. Nevertheless, we decide that Guenther's objection based on "speculation as to [his] state of mind" preserved on appeal the argument that Doe's testimony constituted improper lay opinion.

The requirement for a specific objection " 'serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.' " (*Partida*, *supra*, 37 Cal.4th at p. 434.) " 'In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented.' " (*People v. Flores* (2020) 9 Cal.5th 371, 397 (*Flores*).)

Having considered not only the specific testimony cited in Guenther's argument on appeal, but the entire trial record in which the issue of testimony regarding the other's state of mind arose several times during the trial, we conclude defense counsel's

47

objections to Doe's redirect testimony met this purpose. In *Flores*, the Supreme Court rejected the Attorney General's claim of forfeiture regarding the defendant's failure to object at trial to gang expert testimony "on precisely the same grounds as he does now" (*Flores*, *supra*, 9 Cal.5th at p. 397), citing the court's familiarity with the issue as it arose in the defendant's initial motion to exclude or limit gang-related testimony, as well as his further objection at trial that the expert's examination called for speculation and went beyond the expert's expertise (*id*. at pp. 393–398). In the present case, the trial court addressed objections throughout Guenther's and Doe's testimony about statements by each witness concerning the state of mind of the other person on issues including Guenther's belief that Doe was in love with him, that she enjoyed being submissive in the relationship, and that she was being sincere in her responses to his text messages. The court's rulings reflect a consistent effort to allow testimony grounded in the observations and perceptions of the witnesses without allowing Guenther or Doe to opine on the other's state of mind. Given this context, defense counsel's objection that Doe was being asked to "speculat[e] as to [] Guenther's state of mind" sufficiently alerted the court and the prosecutor to the concern that Doe might be allowed to speculate as to Guenther's state of mind, including in the form of offering improper opinion testimony as to his belief in her consent to participating in the charged sex acts.

The Attorney General cites *People v. Chatman* (2006) 38 Cal.4th 344 (*Chatman*), in support of his forfeiture argument. However, *Chatman* reaffirms the trial court's appropriate exercise of discretion when a percipient witness testifies based on personal observation as to the defendant's behavior being consistent with a state of mind. In *Chatman*, the trial court overruled an objection in the penalty phase of a torture murder trial. (*Id*. at p. 397.) The witness testified that he had observed the defendant kick a high school custodian four or five times. (*Ibid*.) Defense counsel objected to the prosecutor's follow-up question about whether the defendant " 'seemed to be enjoying it' " on grounds

48

that the answer to the question was speculation, irrelevant, and inadmissible under Evidence Code section 352. (*Ibid*.)

On appeal, the defendant asserted that the question about the defendant's " 'enjoying it' " called for improper opinion evidence. (*Chatman*, *supra*, 38 Cal.4th at p. 397.) Our high court ruled that because the defendant "did not object on that basis at trial, [] he may not make that argument on appeal." (*Ibid*.) Nevertheless, the court held that the trial court acted within its discretion in allowing the testimony. It explained, "The witness testified that defendant *seemed* to enjoy kicking the custodian. Because the witness was a percipient witness, he spoke from personal observation. He was competent to testify that defendant's behavior and demeanor were consistent with enjoyment. A history of enjoyment in the infliction of pain is relevant at the penalty phase." (*Ibid*.) The court further observed that an objection for improper opinion evidence "would have failed" in that "a lay witness may not give an opinion about another's state of mind" but "may testify about objective behavior and describe behavior as being consistent with a state of mind." (*Ibid*.)

Here, we have concluded that Guenther's speculation/state of mind objection sufficiently alerted the trial court to the nature of an objection based on lay witness testimony about the other's state of mind. (*Flores*, *supra*, 9 Cal.5th at p. 397.) We therefore reject the Attorney General's forfeiture argument. We further conclude, in any event, that a properly stated objection would have failed because Doe's testimony falls within the framework of allowable lay witness opinion evidence discussed in *Chatman*. Evidence Code section 800 provides that nonexpert testimony in the form of an opinion is permissible to the extent it is "[r]ationally based on the perception of the witness" (*id*., subd. (a)) and "[h]elpful to a clear understanding of his [or her] testimony." (*Id*., subd. (b).) Particularly relevant here, the California Supreme Court has noted circumstances in which such testimony " 'may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on "subtle or complex

49

interactions" between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations.' " (*Sanchez*, *supra*, 63 Cal.4th at p. 456.)

In *Sanchez*, the court held there was no abuse of discretion in allowing testimony over defense objections by a percipient witness who stated based on the defendant's hand movement that the defendant " 'wanted to put another clip inside' " the gun. (*Sanchez*, *supra*, 63 Cal.4th at pp. 454–456.) The court observed, "Exactly what occurred in the few seconds during which defendant pointed the gun at Medina [(the witness)] was subtle and complex, and the [trial] court could reasonably conclude it would be impossible to convey Medina's concrete observations other than through the testimony it permitted." (*Id*. at p. 456; see also *People v. Hinton* (2006) 37 Cal.4th 839, 889 [percipient lay testimony that it appeared the defendant was " 'directing' " the drug transaction by the victim "rested on subtle or complex interactions between [the victim] and defendant that were difficult to put into words, which would render [the witness]'s opinion proper"].)

As the record demonstrates, the relationship between Guenther and Doe was multifaceted and complex. Guenther argues that Doe "had already told the jury that she had communicated to [] Guenther that she wanted no longer to continue the sexual relationship," that she let him know by " 'body language,' " " 'sounds,' " " 'sighs of reluctance,' " and " 'uninterest or disinterest' " that she did not want to continue the relationship, and that the jury had been shown "mountains of Instagram messages." Given the ample evidence based on Doe's concrete observations and text messages, Guenther contends that to admit her lay opinion was error. However, a lay witness may express an opinion based on her " 'impression of what . . . she observes regarding the appearance and demeanor of another' " (*Sanchez*, *supra*, 63 Cal.4th at p. 456), particularly where the impression " 'rests on "subtle or complex interactions" between them' " (*ibid*.), as was the case here. Such lay opinion "is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters

. . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' " (*People v. Williams* (1988) 44 Cal.3d 883, 915.) Lay opinion in these instances must be "rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547 (*Chapple*).)

Doe testified extensively regarding Guenther's treatment of her in September, October, and November 2020, and her attempts to assuage him and maintain her work and pay by complimenting and flattering him, and through her work ethic and sexual obedience. Her opinion that Guenther was not fooled about whether she wanted to continue their sexual relationship was based on her personal observations of and experience with him from their message exchanges, which the jury also had at its disposal, as well as her interactions with him over nearly two years, which the jury learned of only from Doe's and Guenther's testimony. Additionally, Doe's opinion on Guenther's state of mind (i.e., that he was not merely deluded that she wanted to continue the sexual relationship) may have been helpful to the jury to understand her perceptions of his willingness to act on his threats to her pay or her job and her continued acquiescence to his demands. (Evid. Code, § 800, subds. (a), (b).)

Given the many factors influencing Doe's ongoing participation in and submission to the daily sex acts, we decide it was not error for Doe to state an opinion, based on her perception of Guenther and their patterns of engagement, that it was her perception he was not "fooled" by her overt acts of submission or expressions of love. Furthermore, Doe's opinion, based on the range of interactions and communications with Guenther during the relationship, is derived from common human experience not requiring specialized background or scientific knowledge. (*Chapple, supra*, 138 Cal.App.4th at p. 547.) We conclude the trial court did not abuse its discretion in concluding that Doe's testimony based on her perceptions and familiarity with the interactions with Guenther

51

was not speculative and admissible in this context.[15]  (*Sanchez*, *supra*, 63 Cal.4th at p. 456.)

### D.  *Cruel and/or Unusual Punishment*

Guenther acknowledges that the constitutional prohibitions against cruel and/or[16] unusual punishments "are applied sparingly."  He nevertheless asks this court to consider whether the imposition of a 60-year-sentence on a 40-year-old man constitutes a de facto sentence of life without the possibility of parole in violation of the federal and state prohibitions against cruel and/or unusual punishment.

Guenther recognizes that he made "serious mistakes" but maintains he believed— whether "reasonably, unreasonably, or delusionally"—Doe's expressions of love and sexual interest and that the sex was consensual.  He argues that "[f]or his callousness, stupidity, and weakness, he is serving a de facto sentence of life without parole."  He

---

[15] Even assuming the trial court erred in admitting Doe's opinion testimony, Guenther has not shown prejudice under the applicable standard for state law error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *Partida*, *supra*, 37 Cal.4th at p. 439.) Given the extensive evidence that Guenther used demeaning, controlling, and threatening communications to coerce Doe into continuing to submit to his sexual demands, Doe's lay witness conclusion that Guenther knew she was not consenting to the sexual conduct adds little or nothing to the force of that evidence underlying her lay perception.

Furthermore, having reached a decision on the merits, we need not address Guenther's related claim that the alleged erroneous admission of Doe's testimony deprived Guenther of his rights under the Sixth and Fourteenth Amendments to have a jury determine whether the prosecution had proven beyond a reasonable doubt that he had not reasonably believed Doe's participation in the sex acts during the charging window was consensual.  Guenther does not make an alternative argument that admission of this testimony separately violated his constitutional rights.  Nor do we reach whether the alleged error was prejudicial.

[16] Guenther states his arguments using the "cruel and/or unusual" alternative.  We understand and use this phrasing as a shorthand reference to challenging his sentence under both the federal and state Constitutions.  (See *People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*) [noting that the Eighth Amendment to the United States Constitution " 'prohibits the infliction of "cruel *and* unusual" punishment,' " while article I, section 17 of the California Constitution " 'prohibits infliction of "[c]ruel *or* unusual" punishment.' "].)  The Court of Appeal stated in *Baker*, " '[t]he distinction in wording is "purposeful and substantive rather than merely semantic." ' "  (*Id*. at p. 723.)

52

contends his term is excessive under these circumstances, especially given statistical data showing that incarceration reduces life expectancy, making it "unlikely" that he will approach the 81 years or more expected outside of prison and "resulting in a de facto LWOP [life without parole] sentence."

The Attorney General responds that this case is not one of the limited instances in which a punishment exceeds the constitutional limits of cruel and/or unusual punishment. It notes that the trial court imposed the mitigated sentence on all counts, reducing Guenther's punishment from the prosecution's recommended term of 120 years to 60 years. The Attorney General maintains that this term is not disproportionate given the nature of Guenther's conduct and convictions and asserts that Guenther's life expectancy argument fails to establish cruel and/or unusual punishment.

### 1. Additional Background

Prior to sentencing, Guenther argued that the imposition of a total 60-year term, recommended by the probation report, would violate his rights under the Eighth Amendment of the United States Constitution as well as article I, section 17 of the California Constitution. He maintained his sentence was disproportional under the three-pronged analysis used by California courts to assess disproportionality of the punishment to the crime. In arguing disproportionality, Guenther emphasized that while all forms of sexual assault deserve punishment, "some sexual assaults are objectively more serious and dangerous than others" and urged that the "unusual" theory of the case (duress) and history of the consensual sexual relationship and "blurred" personal and professional relationship between Guenther and Doe reduced the severity of the crimes. Guenther further asserted that a comparison between his convictions and the punishment prescribed for equal or more serious crimes demonstrated that a 60-year-sentence without the opportunity for earlier release is "unfair and disproportionate."

The district attorney argued that numerous aggravating factors, including the "cruel and callous nature of the crimes" (Cal. Rules of Court, rule 4.421(a)(1)), the

"particular vulnerability of the victim, as [Guenther]'s employee and intimate partner" (*id*., rule 4.421 (a)(3)), and the "sophisticated manner in which [he] carried out the crimes" (*id*., rule 4.421(a)(8)) justified imposition of the midterm for counts 1 to 10 and high term for counts 11 to 20.  Nevertheless, citing newly enacted changes to the sentencing law requiring a jury finding as to aggravating circumstances to support a high term (see § 1170, subd. (b)(2)), the district attorney requested imposition of the middle term as to all counts for a total prison sentence of 120 years.

The trial court sentenced Guenther to state prison for a term of 60 years, consisting of consecutive mitigated terms of three years for each of the 10 counts of oral copulation and 10 counts of sodomy.  In so doing, the court rejected Guenther's constitutional claims based on disproportional punishment.  It explained, based on the three-pronged analysis applied by California courts, that Guenther "committed 20 separate acts of sodomy and oral copulation in a callous and cruel manner.  Such conduct is dangerous to society.  Serving consecutive sentences for 20 separate acts is not grossly disproportionate to [] Guenther's individual culpability for his persistent callous, cruel, abusive behavior toward [] Doe, and his demands that she submit to daily oral and anal sex if she wanted to keep her job."  The court rejected the defense's comparison of Guenther's punishment with that prescribed for more serious crimes in the same jurisdiction, noting that the defense's analysis "doesn't take into account the multiple acts in this case" and concluding that comparing "three years for one act of sodomy or oral copulation, [to] 15 years to life for one act of second-degree murder . . . is not so disproportionate as to constitute cruel and unusual punishment."

In electing the lower term, the trial court found as a mitigating circumstance that Guenther had no criminal history.  It concluded that under the circumstances of the case, a total term of 60 years was appropriate to meet the objectives the court must balance in imposing sentence, noting "Guenther is 40 years old today, and likely will be a very elderly gentleman before he can be released from custody."

2. Applicable Law

Both the federal and state Constitutions proscribe cruel and unusual punishment by prohibiting a sentence that is disproportionate to the severity of the offense. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.) (*Harmelin*)[17]; *People v. Marshall* (1990) 50 Cal.3d 907, 938 (*Marshall*).)

The Eighth Amendment contains a " 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 (*Ewing*).) "This right protects persons from excessive punishment, so that a sanction for criminal behavior is graduated and proportional to the severity of the offense." (*In re Bolton* (2019) 40 Cal.App.5th 611, 616.) However, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin*, *supra*, 501 U.S. at p. 1001 (conc. opn. of Kennedy, J.).) Consequently, "[s]uccessful challenges based on proportionality are extremely rare." (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; see *Lockyer v. Andrade* (2003) 538 U.S. 63, 73 [noting "the precise contours" of the gross disproportionality principle in Eighth Amendment jurisprudence "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case"]; *Ewing*, at p. 21.)

Article I, section 17 of the California Constitution " 'separately and independently lays down the same prohibition' " against " 'the imposition of a penalty that is

---

[17] "In *Harmelin*[], a majority of the court held that a state mandatory sentence of life without possibility of parole for possession of substantial amounts of cocaine did not constitute cruel and unusual punishment under the federal Constitution. Two justices were of the view that in cases not involving the death penalty, the Eighth Amendment provides for *no* judicial review whether the length of a legislatively mandated sentence is excessively disproportionate to the crime ([*Harmelin*, *supra*, 501 U.S.] at pp. 962–994); the three concurring justices agreed that the length of a legislatively mandated sentence could be held unconstitutional, but only in cases of 'extreme sentences that are "grossly disproportionate" to the crime.' " (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 (*Martinez*).)

disproportionate to the defendant's "personal responsibility and moral guilt." ' " (*Marshall*, *supra*, 50 Cal.3d at p. 938.) Under the California Constitution, a sentence may violate the prohibition against cruel or unusual punishment if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).) Three factors in ascertaining if a punishment is cruel or unusual are (1) the nature of the offense and the nature of the offender with regard to the degree of danger both present to society, (2) a comparison of the punishment with the punishments prescribed for more serious crimes in the jurisdiction, and (3) a comparison of the punishment with punishments for the same offense in other jurisdictions. (*Lynch*, at pp. 425–427.)

We independently decide as a question of law whether a punishment is cruel or unusual, viewing any underlying disputed facts in the light most favorable to the judgment. (*Martinez*, *supra*, 76 Cal.App.4th at p. 496; see *Marshall*, *supra*, 50 Cal.3d at p. 938.)

### 3. Analysis

The United States Supreme Court has held that application of the Eighth Amendment's " 'narrow proportionality principle' " (*Ewing*, *supra*, 538 U.S. at p. 20) is reserved for " 'extreme sentences that are "grossly disproportionate" to the crime' " (*id.* at p. 23). (See *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310 (*Andrade*) [noting limited application of Eighth Amendment proportionality principle].) In *Harmelin*, the Supreme Court upheld a mandatory sentence of life without the possibility of parole for a first-time offender convicted of possessing 672 grams of cocaine. (*Harmelin*, *supra*, 501 U.S. at pp. 990–995 (lead opn. of Scalia, J.).) And in *Ewing*, the Supreme Court held that a "sentence of 25 years to life in prison, imposed for the offense of felony grand theft under the three strikes law, is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on cruel and unusual punishments." (*Ewing*, at

56

pp. 30-31.) *Ewing* emphasized the Supreme Court's "traditional deference to legislative policy choices" on sentencing. (*Id*. at p. 25.)

Guenther was sentenced on each count to the lower term under the triad selected by the state legislature for the category of sex offenses. (§§ 286(c)(2)(A), 287(c)(2)(A).) That the consecutive mitigated sentences of three years for each sex offense gave rise to a 60-year prison term reflects the number of counts for which Guenther was convicted and does not render the sum of those sentences disproportional. Guenther has not shown this to be " 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' " (*Ewing*, *supra*, 538 U.S. at p. 30.) We therefore direct our attention to the focal point of Guenther's arguments—whether, applying the considerations outlined in *Lynch*, the 60-year aggregate sentence constitutes cruel or unusual punishment under the California Constitution.

The first *Lynch* factor, accounting for "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*Lynch*, *supra*, 8 Cal.3d at p. 425), does not favor Guenther. The nature of the offenses in this case reflects egregious and escalating abuse by Guenther of his power over his employee, culminating in repeated and explicit threats to her livelihood if she failed to appear for and participate in the twice-daily routine of oral sex and anal sex that he had established. As noted by the trial court and supported by substantial evidence at trial, Guenther committed the 20 separate acts of sodomy and oral copulation by duress "in a callous and cruel manner." Taking into consideration "the totality of the circumstances surrounding the commission of the offense in the case at bar, including . . . its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts" (*Dillon*, *supra*, 34 Cal.3d at p. 479), these crimes were harmful to Doe and motivated by a dangerous and obsessive need for dominance and control.

Furthermore, Guenther's "individual culpability as shown by such factors as []
age, prior criminality, personal characteristics, and state of mind" (*Dillon*, *supra*, 34
Cal.3d at p. 479) is significant. Guenther's lack of prior criminal history is
overshadowed by his apparent disregard for Doe's emotional or physical wellbeing, his
sophistication in exploiting the power differential to ensure ongoing sexual access to his
employee who had expressed, on more than one occasion, a desire to end the sexual
relationship, and the escalating use of overt and implied threats to coerce Doe's continued
participation in the sexual relationship. (See *Baker*, *supra*, 20 Cal.App.5th at p. 725
[explaining the defendant's "insignificant criminal record" and lack of prior history of
sex crimes are favorable to him but "do not outweigh the other factors"].) The trial court
found in denying the motion for a new trial that Guenther's verbal and emotional abuse
of Doe was "among the most misogynistic, degrading, and, simply, hurtful emotional and
verbal abuse [the court had] witnessed." The record amply supports the trial court's
observations.

Under these circumstances, Guenther's sentence—comprising 20 consecutive
mitigated terms—is not " 'so disproportionate . . . that it shocks the conscience and
offends fundamental notions of human dignity' " (*Dillon*, *supra*, 34 Cal.3d at p. 478)
when the nature of the offenses and offender are considered. (See *Andrade*, *supra*, 238
Cal.App.4th at p. 1310 [rejecting cruel or unusual punishment claim where the defendant,
despite a lack of prior criminal record and low recidivism risk, received an aggregate
term of 195 years to life for sex offenses in which he targeted "young, vulnerable women,
coupled with [] threats and statements that he was affiliated with law enforcement,
demonstrat[ing] an intent to avoid detection by intimidating his victims"].) On the
contrary, the record shows that the trial court considered the relevant sentencing factors
and constitutional principles in rejecting Guenther's argument that his aggregate sentence
was disproportional to his crimes under the unique circumstances in which they occurred.

Guenther contends that his age and life expectancy in prison together makes the sentence imposed the equivalent of life without the possibility of parole. But this fact does not render his sentence unconstitutional. Courts have upheld life sentences for comparable crimes. (See, e.g., *Baker*, *supra*, 20 Cal.App.5th at p. 733; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531–532; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230; *People v. Edwards* (2019) 34 Cal.App.5th 183, 191–192.)

We conclude that the statutory punishment imposed is not grossly disproportionate considering the nature of the offenses and the nature of the offender as it relates to the degree of danger to society. As Guenther does not make any specific arguments on appeal concerning the second or third *Lynch* factors, we decline to review the sentence with respect to the penalties prescribed for other crimes within and outside our jurisdiction.

### III.  DISPOSITION

The judgment is affirmed.

_____
Danner, J.

WE CONCUR:


_____
Grover, Acting P. J.



_____
Bromberg, J.




**H049810**
***People v. Guenther***

Trial Court:     County of Santa Clara

Trial Judge:     Honorable Elizabeth C. Peterson

Counsel:         Kyle Gee, by appointment of the Court of Appeal under the Sixth District
                 Appellate Program, for Defendant and Appellant.

                 Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
                 General, Jeffrey M. Laurence, Senior Assistant Attorney General,
                 Catherine A. Rivlin, Supervising Deputy Attorney General and Allen
                 R. Crown, Deputy Attorney General, for Plaintiff and Respondent.

**H049810**
*People v. Guenther*